

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00076-CR
No. 02-22-00077-CR

_____

ANTWON PINKSTON, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 462nd District Court
Denton County, Texas
Trial Court Nos. F19-3852-211, F19-3853-211

_____

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

During a traffic stop, Appellant Antwon Pinkston opened fire on two police officers, missing one and shooting the other in the head. A jury found Pinkston guilty of two counts of aggravated assault of a public servant, and it assessed his punishment at confinement for life on one count and for 35 years on the other.

Pinkston argues that (1) the disjunctive nature of one of his two jury charges authorized a nonunanimous verdict; and (2) the trial court erred by admitting three types of punishment evidence—penitentiary packets that Pinkston claims were not timely disclosed, allegedly unreliable testimony from a fingerprint expert, and allegedly irrelevant testimony from a gang expert linking Pinkston's tattoos to a gang affiliation. Because there is binding Court of Criminal Appeals precedent rejecting Pinkston's first argument, and because his three evidentiary challenges are either unpreserved or concern harmless error, we will affirm.

## I. Background

Pinkston committed his crimes during an October 2019 traffic stop, much of which was recorded on police body-camera footage.

Pinkston was riding in the front passenger seat of a car driven by Michelle Stacey when, around midnight, Denton Police Officer Urban Rodriguez stopped the car for taillight and registration issues. Stacey pulled over in a Taco Bell parking lot, and when Officer Rodriguez approached the vehicle to speak with her, she got out of the vehicle, then sat back down sideways in the driver's seat with her door open and

2

her body facing the officer. Officer Rodriguez's light illuminated Stacey's face for most of their video-recorded conversation, but the light did not extend to Pinkston's face. Pinkston's face remained largely hidden in the interior shadows of the vehicle.

When Officer Rodriguez asked for identification, Pinkston provided his, but Stacey told the officer that her wallet and driver's license had been stolen. Smelling marijuana in the car, Officer Rodriguez asked if Stacey and Pinkston had been smoking the substance, and he indicated that he intended to search the vehicle. As the officer stood talking with Stacey about the marijuana, his body camera captured Pinkston's shadow shifting and moving in the background. Moments later, the body camera jerked and the footage was obscured as Officer Rodriguez yelled, "Hands up now! Hands up now! Move your head lady!" A series of gunshots rang out, and Officer Rodriguez fell to the ground, dropping Pinkston's driver's license next to him.

Officer Cole was walking up to assist with the traffic stop when Officer Rodriguez began yelling for "[h]ands." After hearing the gunshots and seeing Officer Rodriguez fall, Officer Cole took cover behind his patrol vehicle and exchanged gunfire with Pinkston. Stacey then maneuvered her vehicle around Officer Rodriguez's bleeding body, and she and Pinkston fled the scene. When Officer Cole ran up to Officer Rodriguez, he saw that "his skull was gone . . . [and h]is brain was exposed." Again, Officer Cole's perspective was recorded on his body-camera footage.

3

Stacey and Pinkston were apprehended within an hour. They were riding in the same, bullet-riddled car, and they both had gunshot wounds. When a Texas Ranger spoke with Pinkston in an interview room and accused him of shooting a police officer, Pinkston had a muted reaction—he squinted, looked away, and lethargically mumbled that he was cold, wanted to call his grandmother, and needed to use the restroom.[1]

Officer Rodriguez's gunshot wounds to the head and the leg resulted in permanent injuries. He underwent five brain surgeries; the surgeons removed a portion of his skull, placed a permanent titanium plate, and installed a permanent shunt to drain excess brain fluid. His leg wound required an additional surgery to place a permanent rod in his femur. Officer Rodriguez required rehabilitation to learn how to eat, talk, and walk again. At the time of Pinkston's 2022 trial—more than two years after the traffic stop—Officer Rodriguez was still in rehabilitation, he still could not read, he still had language deficits, he still suffered periodic seizures, and he still had limited use of the right side of his body.

---

[1]The remainder of Pinkston's interview was much the same. The Texas Ranger attempted to talk to Pinkston about the traffic stop, but Pinkston repeatedly looked away and mumbled about being cold. When the Texas Ranger provided a coat to warm Pinkston, he continued to mumble that he was cold and that his arm hurt. He repeatedly turned away from the Texas Ranger to curl up in the interview chair in an attempt to go to sleep. The Texas Ranger asked Pinkston "what kind of drugs [he was] on," but Pinkston mumbled that he was on "no drugs at all."

Pinkston was indicted on two counts of first-degree felony aggravated assault of a public servant, with each count enhanced by two prior felony convictions. *See* Tex. Penal Code Ann. §§ 12.42(d), 22.02(a), (b)(2)(B). At trial, Pinkston's theory of the case was that Stacey had been the gunman.[2] Stacey testified to the contrary. Although she told the jury that she did not remember seeing Pinkston with a gun that night, she knew that *she* did not have a gun, so "[c]ommon sense" told her that Pinkston was the shooter. Her testimony was consistent with Officer Rodriguez's body-camera footage in the moments before the shooting, the gunshot trajectory analysis performed on Stacey's vehicle, the locations and patterns of Stacey's and Pinkston's gunshot wounds, and Pinkston's calm and disinterested response when the Texas Ranger accused him of the crime.

At the end of the guilt–innocence phase, the jury received two charges—one for each cause number. The first charge, which concerned the offense against Officer Cole, authorized a guilty verdict if the jury found that Pinkston "threaten[ed] . . . imminent bodily injury by shooting a firearm towards . . . or pointing a firearm at, towards, or in the direction of [Officer] Cole, . . . [while] us[ing] or exhibit[ing] a deadly weapon, to wit: a firearm." *See id.* § 22.02(a)(2). The second charge, which addressed Pinkston's assault of Officer Rodriguez, was slightly

---

[2]Officer Rodriguez could not recall who shot him or where the shots came from. Officer Cole could not see the gunman, but he could tell that the shooting came from inside Stacey's vehicle.

different; it contained disjunctive paragraphs that authorized a guilty verdict if the jury found that Pinkston either (1) "cause[d] serious bodily injury to [Officer] Rodriguez by shooting [him] with a firearm," or (2) "cause[d] bodily injury to [Officer] Rodriguez by shooting [him] with a firearm . . . [while] us[ing] or exhibit[ing] a deadly weapon, to wit: a firearm." *See id.* § 22.02(a). The jury returned guilty verdicts on both counts.

During the punishment phase, the trial court admitted into evidence, among other things, (1) penitentiary packets (commonly referred to as "pen packets") that Pinkston claimed the State had not timely disclosed; (2) testimony from a fingerprint expert, which Pinkston objected to based on "the *Kelly* factors and/or the *Daubert* factors"; and (3) testimony from a gang expert who pointed out components of Pinkston's photographed tattoos that led him to believe that Pinkston was a member of the "5-Deuce Hoova Crips."[3] After hearing the evidence, the jury found all of the prior-felony enhancements to be true, and it returned a verdict of life in prison for the aggravated assault of Officer Rodriguez and 35 years in prison for the aggravated assault of Officer Cole. *See id.* §§ 12.32, 12.42(d), 22.02(b)(2)(B).

---

[3]The gang expert testified that, after looking at the photos of Pinkston's tattoos, he checked the gang database "to support [his] initial opinion or [his] theory that [Pinkston] was a member of the 5-Deuce Hoova Crips."

## II. Discussion

On appeal, Pinkston challenges (1) the disjunctive nature of his jury charge, and (2) the admission of his pen packets, testimony from the fingerprint expert, and testimony from the gang expert.

## A. The trial court did not err by submitting a disjunctive jury charge.

In his first issue, Pinkston contends that the trial court erred by submitting a disjunctive jury charge containing two alternative theories of Officer Rodriguez's aggravated assault—causing serious bodily injury and causing bodily injury while using or exhibiting a deadly weapon. *See id.* § 22.02(a). Pinkston claims that the two theories reflect different offenses because, according to him, aggravated assault based on serious bodily injury is result-oriented while aggravated assault based on bodily injury with the use or exhibition of a deadly weapon is both conduct-oriented and result-oriented.

The Court of Criminal Appeals rejected this argument in *Landrian v. State.* 268 S.W.3d 532, 532–42 (Tex. Crim. App. 2008). There, the jury charge authorized a conviction for aggravated assault if the jury found that the defendant either (1) intentionally or knowingly caused bodily injury using a bottle as a deadly weapon or (2) recklessly caused serious bodily injury by throwing a bottle. *Id.* at 533–34. The court of appeals held that this charge authorized a nonunamious verdict, *id.* at 535, but the Court of Criminal Appeals disagreed, *id.* at 536–42. The court held that "jurors need [not] be unanimous about which aggravating factor or element that they

7

find[;] . . . . the defendant may be convicted [of aggravated assault] if each juror concludes that at least one of the aggravating factors or elements exist." *Id.* at 538–39; *see id.* at 536–42 (explaining that, putting aside assault by threat, aggravated assault is result-oriented, the actus reus is "causing bodily injury," and both aggravating circumstances in Section 22.02 involve the use of a deadly weapon).[4]

Although Pinkston takes issue with *Landrian*'s rationale,[5] we are not at liberty to disregard binding precedent from the Court of Criminal Appeals. *See Weaver v. State*, No. 02-21-00081-CR, 2022 WL 2978730, at *10 (Tex. App.—Fort Worth July 28, 2022, pet. ref'd) (mem. op., not designated for publication) (noting that "a decision of the [C]ourt of [C]riminal [A]ppeals is binding precedent, [and] we are compelled to comply with its dictates" (quoting *State v. Stevenson*, 993 S.W.2d 857, 867 (Tex. App.—Fort Worth 1999, no pet.) (op. on remand))); *cf. Hutto v. Davis*, 454 U.S. 370, 375, 102

---

[4]Whether the jury found that Pinkston caused serious bodily injury or that he caused bodily injury while using or exhibiting a deadly weapon, "both of these means of committing aggravated bodily assault involve the use of a deadly weapon." *Landrian*, 268 S.W.3d at 538. "The first way necessarily implies the use of a deadly weapon, which is [statutorily defined to include] 'anything that in the manner of its use or intended use is capable of causing death or serious bodily injury[,]' [and t]he second way specifies the use of a deadly weapon." *Blount v. State*, 257 S.W.3d 712, 714 (Tex. Crim. App. 2008) (quoting Tex. Penal Code Ann. § 1.07); *see* Tex. Penal Code Ann. § 1.07(a)(17)(B); *Landrian*, 268 S.W.3d at 538 (quoting *Blount*).

[5]Pinkston also argues—without explanation—that the *Landrian* holding was dicta. We disagree. Although *Landrian* involved alternative mens rea findings as part of the alternative aggravating elements, the Court of Criminal Appeals did not confine its holding or rationale to instances of alternative mens rea; it addressed alternative aggravating elements. *See Landrian*, 268 S.W.3d at 536–42.

S. Ct. 703, 706 (1982) (per curiam) ("[U]nless we wish anarchy to prevail within the . . . judicial system, a precedent of [the higher] Court must be followed by the lower . . . courts.").

We overrule Pinkston's first issue.

## B. The trial court's evidentiary rulings were not abuses of discretion.

Pinkston's three other appellate issues question three of the trial court's evidentiary rulings.

### 1. Standard of review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Redmond v. State*, 629 S.W.3d 534, 541 (Tex. App.—Fort Worth 2021, pet. ref'd). The trial court does not abuse its discretion by admitting challenged evidence unless its determination lies outside the zone of reasonable disagreement. *Wells*, 611 S.W.3d at 427; *Redmond*, 629 S.W.3d at 541. And even if a trial court abuses its discretion by admitting evidence, that error must be preserved before a defendant can complain about it on appeal. *See* Tex. R. App. P. 33.1(a). Furthermore, even preserved error in the admission of evidence will not result in a reversal without a showing of harm. *See* Tex. R. App. P. 44.2; *Cook v. State*, No. PD-0850-21, 2023 WL 152984, at *4–5 (Tex. Crim. App. Jan. 11, 2023). And no harm occurs "when a defendant fails to object at trial to cumulative evidence of the same fact . . . or when a defendant fails to challenge other, cumulative evidence of the

9

same fact on appeal." *Mayo v. State*, No. 02-19-00404-CR, 2021 WL 2587065, at *3 (Tex. App.—Fort Worth June 24, 2021, no pet.) (mem. op., not designated for publication); *see Cook*, 2023 WL 152984, at *5 ("The erroneous admission of evidence 'will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling.'" (quoting *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998))).

### 2. Allegedly undisclosed pen packets

Pinkston claims that the trial court erred by admitting his three pen packets[6] into evidence during the punishment phase because, according to him, the State violated Article 39.14 of the Code of Criminal Procedure by failing to disclose the pen packets until the day before they were offered into evidence.[7] *See* Tex. Code Crim. Proc. Ann. art. 39.14(a).

---

[6]"A penitentiary packet or 'pen packet' consists of authenticated records from the Texas Department of Corrections or other penal institution regarding a person's prior convictions." *Carkin v. State*, No. 04-99-00411-CR, 2001 WL 166374, at *2 (Tex. App.—San Antonio Feb. 21, 2001, no pet.) (not designated for publication).

[7]Pinkston also claims that the trial court should have applied Article 39.14 to exclude seven other punishment exhibits: six judgments of conviction and one summary of the disciplinary matters that Pinkston was involved in while he was in prison. But at trial, Pinkston's Article 39.14 objection was limited to the pen packets, and he did not claim that these seven exhibits had not been timely produced. Even on appeal, it is unclear if Pinkston is alleging that these seven exhibits were not timely produced. In fact, he appears to concede that at least some of them were. Either way, Pinkston did not preserve an Article 39.14 challenge to the admission of the seven non-pen-packet exhibits. *See* Tex. R. App. P. 33.1(a). Furthermore, one of the seven exhibits—the summary of prison disciplinary matters—was not admitted into evidence at all; it was admitted for record purposes only.

But the State's alleged failure to disclose the pen packets was just that: alleged. As Pinkston acknowledges, there was a factual dispute on this issue—Pinkston claimed that the three pen packets had not been timely produced, but the State claimed that they had. In this context, the trial court was "the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony," and it resolved the fact issue in the State's favor. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000); *see Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006) (noting that "an appellate court will . . . [']assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record'" (quoting *Ross*, 32 S.W.3d at 855)). We must yield to that determination. *See Guzman*, 955 S.W.2d at 89 ("[A]s a general rule, the appellate courts . . . should afford almost total deference to a trial court's determination of the historical facts . . . based on an evaluation of credibility and demeanor."); *Barlow v. State*, No. 05-21-00392-CR, 2022 WL 16847694, at *4–6 (Tex. App.—Dallas Nov. 10, 2022, no pet.) (mem. op., not designated for publication) (yielding to trial court as "the sole judge of witness credibility" when trial court heard evidence on alleged Article 39.14 violation and denied motion for new trial); *Brown v. State*, No. 06-14-00115-CR, 2015 WL 4396378, at *14–15 (Tex. App.—Texarkana July 20, 2015, no pet.) (mem. op., not designated for publication) (rejecting challenge to evidence that was allegedly untimely produced, noting that willfulness of State's noncompliance with discovery order "turn[ed] on the credibility of the prosecutor's explanations,"

11

and stating that appellate court "owe[d] almost absolute deference to the trial court's implicit conclusion that the prosecutor's conduct was less than willful" (quoting *Francis v. State*, 428 S.W.3d 850, 855 (Tex. Crim. App. 2014))).

But even assuming that the trial court had abused its discretion by admitting the pen packets, the error would have been harmless. A violation of Article 39.14 is a statutory error, and Rule of Appellate Procedure 44.2(b) requires reviewing courts to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b); *Sopko v. State*, 637 S.W.3d 252, 256–57 (Tex. App.—Fort Worth 2021, no pet.). The improper admission of evidence affects a defendant's substantial rights only "when [it] ha[s] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Thomas v. State*, 505 S.W.3d 916, 926 (Tex. Crim. App. 2016) (quoting *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997)); *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010). Here, whatever impact the pen packet might have had on the verdict, it would not have risen to the level of a substantial or injurious effect.

The aggregate of Pinkston's three authenticated pen-packet exhibits contained (1) copies of three of Pinkston's prior judgments of conviction, (2) two pages of full sets of fingerprints corresponding to two of the judgments, and (3) three pages of corresponding mugshot photos.[8]

---

[8]Each pen packet also included a one-page declaration from a records custodian authenticating the exhibit.

12

The three judgments were duplicative—and therefore harmless—because copies of those same judgments were admitted as separate exhibits, and the separate exhibits are not subject to preserved challenges on appeal.[9] *See Leday*, 983 S.W.2d at 718 (reiterating that "overruling an objection to evidence will not result in reversal when other such evidence was received without objection"); *Mayo*, 2021 WL 2587065, at *3–4 (holding admission of challenged testimony harmless when video containing similar statements was not challenged on appeal). The two sets of fingerprints were also duplicative. The State enlarged a fingerprint from each of the two sets, and at trial the State's fingerprint expert explained how the two enlarged fingerprints matched Pinkston's, thereby connecting him to the two criminal cases associated with the pen packets.[10] The State submitted the two enlarged pen-packet fingerprints as separate exhibits, and those exhibits are not challenged on appeal. *See Mayo*, 2021 WL 2587065, at *3–4.

---

[9]As noted *supra* note 7, Pinkston appears to lodge Article 39.14 challenges to several of the judgments admitted during the punishment phase, but he did not preserve those objections below. *See* Tex. R. App. P. 33.1(a).

[10]The State's fingerprint expert noted that one of the enlarged pen-packet fingerprints was a "low-quality print," and because "in general, we're going to need more quantity [of matching characteristics] because we have low quality," the expert used all ten fingerprints in the pen packet and confirmed that all ten were "in pattern agreement."

13

This narrows the nonduplicative portions of the pen-packet exhibits to three pages of mugshot photos.[11] Even if we assume that the State failed to produce such documents until the day before they were admitted into evidence,[12] and even if we assume that the trial court's admission of these exhibits was erroneous, Pinkston has not explained why the mugshots "had a substantial and injurious effect or influence in determining the jury's [punishment] verdict."[13] *Thomas*, 505 S.W.3d at 926 (quoting *King*, 953 S.W.2d at 271). *But see id.* (noting that neither party has the burden on harm).

It is safe to say they did not. The jury saw disturbing body-camera footage in which Officer Rodriguez was shot in the head and left on the ground to bleed. The

---

[11]The mugshots are not inflammatory; they do not depict Pinkston making a provocatory face or gesture, nor do they depict him as unwashed or disheveled. Pinkston's attire in the photos is likewise unnoteworthy.

[12]It is undisputed that, the day before the parties began offering punishment evidence, Pinkston claimed that he did not have copies of the pen packets, and although the State disputed this claim, it provided paper and electronic copies of them at that time. The State offered the pen packets into evidence the following day.

[13]The entirety of the harm analysis in Pinkston's appellate brief reads: "As a result [of the admission of the challenged pen packets], Appellant suffered harm by the erroneous admission of the exhibits that were not properly provided to Appellant's trial counsel that allowed the jury to use same in assessing punishment in this matter."

In his reply brief, Pinkston argues that the pen packets were pivotal because, to enhance his punishment range, the State was required to offer proof of his incarceration—not just proof of his conviction. But the relevant Penal Code language requires evidence of "final[] convict[ion]." Tex. Penal Code Ann. § 12.42(d).

jury also saw Pinkston's seemingly indifferent reaction when a Texas Ranger accused him of committing this crime. The jury heard testimony from Stacey that Pinkston was physically abusive, that he sold and used drugs, and that he was involved in a gang. The jury received copies of more than ten prior judgments of conviction[14] documenting Pinkston's history of committing, among other things, assault, theft, forgery, evading arrest, possession of a controlled substance, and promotion of the prostitution of a minor. The jury heard about Pinkston's prison disciplinary record; a prison warden testified that, according to prison records, Pinkston assaulted prison staff on multiple occasions, he engaged in multiple fights, he destroyed state property, and he refused to work. The jury heard testimony from Pinkston's former parole officer, who indicated that within a week of Pinkston's February 2019 release on parole, he had committed numerous parole violations, a warrant had been issued for his arrest, and he had stopped reporting.[15] And the jury heard from a jail detention officer that while Pinkston was in jail awaiting trial, he threw a liquid substance— either water or urine—at a neighboring inmate's cell and had to be moved to a more isolated area.

---

[14]There was also evidence that Pinkston had multiple juvenile adjudications.

[15]Pinkston's juvenile parole officer also testified. He stated that while Pinkston was on parole for juvenile delinquent conduct, he committed two new instances of delinquent conduct.

Given this body of evidence, it stretches credulity to contend that the jury's sentence was substantially influenced by three pages of standard mugshot photos. We overrule Pinkston's second issue.

### 3. Testimony from the State's fingerprint expert

Next, Pinkston argues that the trial court erred by admitting testimony from the State's fingerprint expert, Investigator Ashleigh Berg. Testifying as an expert in fingerprint analysis, Investigator Berg confirmed that the fingerprints on Pinkston's prior judgments and pen packets matched the fingerprints of the defendant who sat before the jury in the courtroom.

Pinkston claims on appeal that Investigator Berg's testimony was unreliable. For expert scientific testimony to be admissible under Rule 702, it must be reliable. *See* Tex. R. Evid. 702; *Kelly v. State*, 824 S.W.2d 568, 572–73 (Tex. Crim. App.1992); *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–95, 113 S. Ct. 2786, 2796–98 (1993) (establishing similar requirement); *Hartman v. State*, 946 S.W.2d 60, 62 (Tex. Crim. App. 1997) (discussing *Kelly* and *Daubert*). And "to be considered reliable, [it] must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question." *Kelly*, 824 S.W.2d at 573. In *Kelly*, the Court of Criminal Appeals listed seven nonexhaustive factors that "could affect a trial court's determination of reliability":

(1)　　the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community . . . ;

(2)　　the qualifications of the expert[] testifying;

(3)　　the existence of literature supporting or rejecting the underlying scientific theory and technique;

(4)　　the potential rate of error of the technique;

(5)　　the availability of other experts to test and evaluate the technique;

(6)　　the clarity with which the underlying scientific theory and technique can be explained to the court; and

(7)　　the experience and skill of the person[] who applied the technique on the occasion in question.

*Id.* (indentation altered). Pinkston asserts that the fingerprint analysis conducted by Investigator Berg was not reliable because the State failed to offer evidence "on the foregoing items 3, 4, 5, or 6."[16]

First, Pinkston did not raise "items 3, 4, 5, [and] 6" as specific objections to Investigator Berg's testimony at trial. To preserve error, an objection to the admission of evidence must state the specific grounds for the objection, unless the specific grounds are apparent from the context. Tex. R. App. P. 33.1(a)(1)(A); *McKee v. State*, No. 2-06-203-CR, 2007 WL 289496, at *2–3 (Tex. App.—Fort Worth Feb. 1, 2007, no pet.) (per curiam) (mem. op., not designated for publication); *see Scherl v. State*, 7 S.W.3d 650, 652 (Tex. App.—Texarkana 1999, pet. ref'd). Error is not preserved when a party objects to an improper predicate but fails to inform the trial court of exactly how the predicate is deficient. *McKee*, 2007 WL 289496, at *3; *Scherl*, 7 S.W.3d at 652; *see Bird v. State,* 692 S.W.2d 65, 70 (Tex. Crim. App. 1985). "Rule

---

[16]We assume without deciding that Pinkston adequately briefed this issue. *See* Tex. R. App. P. 38.1(i).

17

702, *Daubert*, [and] *Kelly* . . . cover numerous requirements and guidelines for the admission of expert testimony," so a broad objection based on Rule 702, *Daubert*, or *Kelly* is effectively a general objection to an improper predicate. *Scherl*, 7 S.W.3d at 652.

In *Scherl v. State*, for example, the defendant objected to intoxilyzer evidence as "inadmissible under Rule 702, *Daubert*, *Kelly*, and *Hartman*," and the Texarkana Court of Appeals held that this was insufficient to preserve error because "[a]n objection based on Rule 702 and these cases alone [wa]s effectively a general objection to an improper predicate." *Id.* We held similarly in *McKee v. State*, concluding that the defendant failed to preserve her complaint that a trooper was not qualified to give expert testimony on the defendant's use of a vehicle as a deadly weapon. 2007 WL 289496, at *2–3. The defendant objected to the trooper's testimony as having an improper predicate and as a legal conclusion, and although the context of her objection clarified that it was under Rule 702, "Rule 702 and *Daubert* cover numerous requirements and guidelines for the admission of expert testimony," and "[o]bjections based simply on [R]ule 702 and *Daubert* alone are, in effect, general objections to an improper predicate and do not adequately inform the trial court of any specific complaint upon which it is to rule." *Id.* at *1–3. The defendant thus failed to preserve her specific complaint about the trooper's expert qualifications. *Id.* at *3.

18

Here, Pinkston "request[ed] a 705(b) hearing[17] with regard to any type of purported fingerprint evidence," and during that hearing, he cross-examined Investigator Berg on a variety of issues, including her qualifications, how long her analysis took, whether her analysis had been peer-reviewed, whether inherent bias could impact fingerprint analysis, whether fingerprint analysis was objective or subjective, where the ACE-V method of fingerprint analysis that she had used came from, and how many commonalities were required for two fingerprints to be considered a match. At the conclusion of the hearing, Pinkston argued that he "d[id]n't think that we ever g[o]t anywhere by clear and convincing evidence passing over the *Kelly* factors and/or the *Daubert* factors based on the testimony of the witness."[18] He did not identify what *Kelly* factors he thought were lacking, nor did he specify the predicate deficiency that allegedly rendered Investigator Berg's testimony inadmissible. And given the scope of his questions on cross-examination, the specific grounds for his objection were not clear from the context. *See* Tex. R. App. P. 33.1(a)(1)(A). Pinkston thus waived his appellate complaint that the alleged absence

---

[17]*See* Tex. R. Evid. 705(b) ("Before an expert states an opinion or discloses the underlying facts or data, an adverse party . . . in a criminal case must . . . be permitted to examine the expert about the underlying facts or data. This examination must take place outside the jury's hearing.").

[18]When the trial court ruled that it would allow Investigator Berg's expert testimony, Pinkston obtained a running objection to the fingerprint testimony for "everything that's been raised outside the jury's presence."

of "[*Kelly*] items 3, 4, 5, or 6" undermined the reliability of Investigator Berg's testimony.

Even if Pinkston had preserved his complaint, though, it would be off the mark. The seven *Kelly* factors are considerations "that *could*"—but might not—"affect a trial court's determination of reliability." *Kelly*, 824 S.W.2d at 573 (emphasis added). The *Kelly* factors do not serve as a mandatory checklist; evidence of every factor is not required in every case, nor does the absence of a single factor automatically render the expert's testimony unreliable under *Kelly*. *Cf. Vela v. State*, 209 S.W.3d 128, 134 (Tex. Crim. App. 2006) (noting that "[t]he reliability inquiry is . . . a flexible one" that "even if the traditional *Kelly* reliability factors do not perfectly apply to particular testimony, the proponent is not excused from proving its reliability"); *Wolfe v. State*, 459 S.W.3d 201, 205 (Tex. App.—Fort Worth 2015) (similar, citing *Vela*), *aff'd*, 509 S.W.3d 325 (Tex. Crim. App. 2017).

Plus, Pinkston himself elicited testimony from Investigator Berg on several of the *Kelly* factors that he claims are missing. On cross-examination, he asked her about the rate of error (factor 4)—which, according to Investigator Berg, "[s]tudies have shown . . . can be as high as 7 percent [erroneous exclusions]"—and he had her identify the person who had verified her analysis of Pinkston's prints (factor 5)— "David Taylor, who is also a certified latent print examiner." *See Kelly*, 824 S.W.2d at 573. As for factor 6, Investigator Berg's detailed description of the ACE-V analysis

was itself a demonstration of the "clarity with which the underlying scientific theory and technique c[ould] be explained to the court." *Id.*

Because Pinkston did not preserve this third issue, and because it would have been fruitless even if it had been preserved, we overrule it.

### 4.     Testimony regarding Pinkston's gang affiliation

In his fourth and final issue, Pinkston challenges the admission of testimony from the State's gang expert, who interpreted Pinkston's photographed, gang-related tattoos as indicative of his gang affiliation.  Pinkston claims that his alleged gang affiliation "was irrelevant," that the gang expert was speculating about his gang affiliation based on "no evidence," that the expert testimony linking him to a gang was "more prejudicial than probative," that such testimony was inadmissible under *Beasley v. State*, 902 S.W.2d 452 (Tex. Crim. App. 1995) (plurality op.), *superseded by statute as recognized in Beham v. State*, 559 S.W.3d 474, 479 (Tex. Crim. App. 2018),[19] and that the expert's use of his tattoos to link him to a gang violated his constitutional right "to place any tattoo of any sort on his body and associate with anyone he chooses."[20]

---

[19]As the Court of Criminal Appeals has clarified, "*Beasley* is not binding authority."  *Beham*, 559 S.W.3d at 479 (noting that *Beasley* is "a plurality opinion construing an iteration of Article 37.07 that was more narrowly drafted than the present law").

[20]At trial, Pinkston objected to the admission of photos of his gang-related tattoos "under the 1st Amendment of breaching the freedom of speech, as well as the 14th Amendment for due process, as well as Article 1, Section 8 of the Texas

But the gang expert was not the only person to testify that Pinkston's gang-related tattoos evidenced his gang affiliation. After the gang expert took the stand, Stacey testified that she "kn[e]w [Pinkston] to be involved in a gang," and when she was asked "[h]ow," she responded that "[i]t's tatted on his body." Pinkston did not object to this duplicative testimony, nor does he challenge it on appeal.[21] Even if the trial court had erred by admitting the gang expert's testimony, then, the error was rendered harmless by Stacey's unobjected-to testimony of the same fact. *See Cook*, 2023 WL 152984, at *5; *cf. Parks v. State*, No. 02-22-00011-CR, 2023 WL 2325506, at *9 (Tex. App.—Fort Worth Mar. 2, 2023, no pet.) (mem. op., not designated for

---

Constitution, the right to publish on any subject, and as well as objections under due course of law under Article 1, Section 19." But he did not object to the exhibits as irrelevant or as more prejudicial than probative.

[21]Pinkston secured a running objection "throughout the entirety of [the gang detective's] testimony," but the running objection did not extend to Stacey's testimony. *See Blue v. State*, No. 02-17-00265-CR, 2018 WL 6844134, at *7–8 (Tex. App.—Fort Worth Dec. 31, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that running objection asserted on multiple grounds, some of which were specific to witness, did not extend to different witness's testimony on same issue); *Reid v. State*, No. 10-14-00107-CR, 2015 WL 6584361, at *2–3 (Tex. App.—Waco Oct. 29, 2015, pet. ref'd) (mem. op., not designated for publication) (noting that running objection "on this issue" raised during one witness's testimony did not extend to similar testimony from three other witnesses); *Warner v. State*, No. 2-07-464-CR, 2009 WL 2356861, at *2–3 (Tex. App.—Fort Worth July 30, 2009, pet. ref'd) (mem. op., not designated for publication) (holding that running objections raised during one witness's testimony did not extend to similar testimony from another witness); *cf. Sattiewhite v. State*, 786 S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989) (cautioning that "an advocate who lodges a running objection should take pains to make sure it does not encompass too broad a reach of subject matter over too broad a time or over different witnesses").

publication) (holding admission of challenged statement harmless because the same fact came in through unchallenged statement); *Mayo*, 2021 WL 2587065, at *3–4 (holding admission of challenged testimony harmless when video containing similar statements was not challenged on appeal); *Redmond*, 629 S.W.3d at 546 n.14 (holding admission of testimony regarding unadjudicated robberies harmless when photo depicting robbery was not objected to).

Moreover, a reasonable juror could infer that Pinkston had gang-related "tatt[ooing] on his body" by examining the tattoo photos for themselves. Such photos depicted, for example, the word "HOOVA" in large block letters across Pinkston's stomach and the phrase "Crippin" in large block letters across his back. Although Pinkston objected to testimony regarding these photos at trial, his appeal does not challenge the photos' admission into evidence. *See Mayo*, 2021 WL 2587065, at *4.

Because the gang expert's testimony was duplicative of other, unchallenged evidence, we overrule Pinkston's final issue.

23

## III. Conclusion

Having overruled all four of Pinkston's issues, we affirm the trial court's judgments of conviction. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  April 20, 2023